**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE ESTATE OF AYELET ARNIN, by and through its
personal representative and heir, DEBORAH
HARTSTON;

DEBORAH HARTSTON, individually, as personal
representative and heir of the Estate of Ayelet Arnin;

MORDECHAI DAVID ARTZI;

TAMARA EVEN YAACOBI;

NATAN ARTZI;

YEMIMA BETZALEL;

FABIEN BLUESTEIN, individually and as parent and
natural guardian for minors A.B., I.B., and O.A.B.;

BAT-EL BLUESTEIN, individually and as parent and
natural guardian for minors A.B., I.B., and O.A.B.;

A.B., minor, by her parents and natural guardians;

I.B., minor, by his parents and natural guardians;

O.A.B., minor, by his parents and natural guardians;

NIV COHEN;

YOSHUA HAI DANINO, individually and as parent and
natural guardian for minors, A.D.P.1 and A.D.P.2;

TAL PEER, individually and as parent and natural
guardian for minors,;

A.D.P.1, minor, by his parents and natural guardians;

A.D.P.2, minor, by his parents and natural guardians;

ZOHARA SARA DANINO;

HARRY BRIAN HAZEN, individually and as parent and
natural guardian for minors, Y.H., S.Y.H., S.H., P.S.H.,
C.S.H., A.P.H., and A.D.H.;

MICHELLE JOY HAZEN, individually and as parent and
natural guardian for minors, Y.H., S.Y.H., S.H., P.S.H.,
C.S.H., A.P.H., and A.D.H.;

Y.H., minor, by his parents and natural guardians;

S.Y.H., minor, by his parents and natural guardians;

S.H., minor, by her parents and natural guardians;

P.S.H., minor, by his parents and natural guardians;

C.S.H., minor, by his parents and natural guardians;

A.P.H., minor, by his parents and natural guardians;

A.D.H., minor, by his parents and natural guardians;

ELIEZER SIMCHA HAZEN;

BETZALEL ZVI HAZEN;

MICHAEL CHAIM HAZEN;

MOSHE YOSEF HAZEN;

Civ No. 1:24-cv-02543

TUVIA NOACH HAZEN;
HEN RACHEL HOOGI;
GAL LAPID;
INBAL LAPID;
SMADAR LAPID;
RAZ NISIM;
ADIRON LEVY;
ASTAR MOSHE;
ADIEL RAVID;
RAZ MOSHE RAVID;
AVISHAY RAVID;
LEAH SHLOMO RAVID;
EFRAIM ROSENFELD, individually and as parent and
natural guardian for minor A.R.;
A.R., minor, by his father and natural guardian;
EITAN SAGRON, individually and as parent and natural
guardian for minor, A.S.;
SHIMRIT SAGRON, individually and as parent and
natural guardian for minor, A.S.;
A.S., minor, by her parents and natural guardians;
SHANI SILVERMAN, individually and as parent and
natural guardian for minors A.T. and U.T.;
AMOS TESHUVA, individually and as parent and natural
guardian for minors A.T. and U.T.;
A.T., minor, by her parents and natural guardians;
U.T., minor, by his parents and natural guardians;
SHLOMO TOBI;
ALON LANKRI, individually and as parent and natural
guardian for minors Y.L. and L.L.;
AVITAL BEN-DROR LANKRI
Y.L., minor, by his parents and natural guardians;
L.L., minor, by her parents and natural guardians;
NECHAMA SHOR, individually and as parent and
natural guardian for minors A.T. and U.T.;
DANIEL SHOR, individually and as parent and natural
guardian for minors C.S.S. and S.S.S.;
C.S.S., minor, by her parents and natural guardians; and
S.S.S., minor, by her parents and natural guardians,

Plaintiffs,

    vs.

THE SYRIAN ARAB REPUBLIC,

Defendant.

_____/

## AMENDED COMPLAINT

Plaintiffs, by and through undersigned counsel, bring this action for damages against Defendant, the Syrian Arab Republic ("Syria" or "Defendant"), and allege as follows:

## INTRODUCTION

1.      This is a civil action brought pursuant to the "Terrorism Exception" to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"), seeking damages for wrongful death, personal injury, and related torts, resulting from a massive terrorist attack ("Terrorist Attack" or "Attack") carried out by Islamic Resistance Movement a/k/a "Harakat al-Muqawamah al-Islamiyya" ("Hamas") on October 7, 2023.

2.      Hamas has been designated by the U.S. government as a Specially Designated Terrorist ("SDT") (since 1995), a Foreign Terrorist Organization ("FTO") (since 1997), and a Specially Designated Global Terrorist ("SDGT") (since 2001).

3.      The Hamas Attack had two prongs. In the early hours of October 7, 2023, Hamas launched a massive rocket barrage towards civilian centers throughout Israel. Simultaneously, and under the cover of the rocket attacks, approximately 3,000 heavily-armed Hamas terrorists breached the border between Gaza and Israel in multiple locations. They flooded into Israel seeking to murder, maim, torture, rape, injure, and abduct as many victims as possible.

4.      The Hamas invasion into Israel and the terrorists' pursuit of victims continued for many hours—and in some locations, days—before Israeli security forces regained control over territory Hamas had rampaged.

5.      Plaintiffs herein are U.S. nationals and their immediate family members who were among the victims of the Attack.

6.      Some victims were among those murdered and physically injured in the Attack. Some were among those who fled through streets, fields, and orchards over the course of many harrowing hours while pursued and shot at by murderous Hamas terrorists. Some were trapped in their homes or shelters for long hours of relentless Hamas rocket fire while Hamas terrorists scoured the streets outside and broke into buildings hunting and murdering civilians. One was a volunteer for the ZAKA emergency search and rescue organization who was exposed to the most gruesome scenes of brutality imaginable while under constant fire.

7.      Defendant Syria provided Hamas with material support and resources, authorized and ratified the actions of its officers, employees, and agents described herein, and took other actions which facilitated, enabled, and caused the Terrorist Attack.

8.      Syria is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)), as continued pursuant to 50 U.S.C. § 4826

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter and over the defendant pursuant to 28 U.S.C. §§ 1330, 1331, 1367, and 1605A.

10.      Defendant is subject to suit in the courts of the United States as a sponsor of the terrorist group Hamas pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A(a), and related statutes, including Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j) as continued pursuant to 50 U.S.C. § 4826, Section 40 of the Arms

Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), under which Syria has been designated as a state sponsor of terrorism.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f).

## PARTIES

12.    Ayelet Arnin was, at all relevant times, a United States citizen. Ayelet was murdered at age 22 on October 7, 2023, in the Terrorist Attack. The Estate of Ayelet Arnin brings this action through its personal representative and heir, plaintiff Deborah Hartston.

13.    Plaintiff, Deborah Hartston is, and at all times relevant hereto was, a United States citizen. She is the bereaved mother of Ayelet Arnin. Pursuant to an Inheritance Order issued on November 15, 2023, Deborah Hartston is heir of the Estate of Ayelet Arnin. Deborah Hartston brings this action individually, and as the personal representative and heir of the Estate of Ayelet Arnin.

14.    Plaintiff, Mordechai Artzi is, and at all times relevant hereto was, a United States citizen. Mordechai Artzi was present at the scene of the Attack. He is also the partner of Plaintiff Tamara Even Yaacobi and the brother of Plaintiff Natan Artzi.

15.    Plaintiff, Tamara Even Yaacobi is the partner of Plaintiff Mordechai Artzi. They share a relationship that is the functional equivalent of marriage. Tamara was with Mordechai Artzi at the scene of the Attack.

16.    Plaintiff, Natan Artzi is, and at all times relevant hereto was, a United States citizen. Natan Artzi was present at the scene of the Attack. He is also the brother of Plaintiff Mordechai Artzi.

17.     Plaintiff, Yemima Betzalel is, and at all times relevant hereto was, a United States citizen. Yemima Betzalel was present at the scene of the Attack.

18.     Plaintiff, Fabien Bluestein is the father of OAB, A.B., and I.B. Fabien brings this action individually and as parent and legal guardian of his minor children, OAB, A.B., and I.B. Fabien Bluestein was present at the scene of the Attack.

19.     Plaintiff, Bat-El Bluestein is the mother of OAB, A.B., and I.B. Bat-El brings this action individually and as parent and legal guardian of her minor children, OAB, A.B., and I.B. Bat-El Bluestein was present at the scene of the Attack.

20.     Plaintiff, OAB is, and at all times relevant hereto was, a United States citizen,  and was present at the scene of the Attack.

21.     Plaintiff, A.B. is a sibling of OAB and was present at the scene of the Attack.

22.     Plaintiff, I.B. is a sibling of OAB and was present at the scene of the Attack.

23.     Plaintiff, Niv Cohen is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack.

24.     Plaintiff, Yoshua Hai ("Shuki") Danino is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack. Shuki Danino is also the husband of Plaintiff, Tal Peer, the father of minor Plaintiffs, A.D.P.1 and A.D.P.2, and the son of Plaintiff, Zohara Sara Danino.

25.     Plaintiff Tal Peer is the wife of Shuki Danino, and the mother of minor Plaintiffs, A.D.P.1 and A.D.P.2. Tal Peer was present at the scene of the Attack.

26.     Plaintiff, A.D.P.1 is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack. A.D.P.1 is the son of Plaintiffs, Shuki Danino and Tal Peer, and the brother of Plaintiff, A.D.P.2.

27.     Plaintiff, A.D.P.2 is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack. A.D.P.2 is the son of Plaintiffs, Shuki Danino and Tal Peer, and the brother of Plaintiff, A.D.P.1.

28.     Plaintiff, Zohara Danino is, and at all times relevant hereto was, a United States citizen. She is the mother of Plaintiff, Shuki Danino.

29.     Plaintiff Harry Brian Hazen is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack. Harry Hazen brings this action individually and as parent and legal guardian of his minor children, Y.H., S.Y.H., S.H., P.S.H., C.S.H., A.P.H., and A.D.H.

30.     Plaintiff Michelle Joy Hazen is, and at all times relevant hereto was, a United States citizen. Michelle Hazen is the wife of plaintiff, Harry Hazen. Michelle Hazen brings this action individually and as parent and legal guardian of her minor children, Y.H., S.Y.H., S.H., P.S.H., C.S.H., A.P.H., and A.D.H.

31.     Plaintiff Tuvia Noah Hazen is, and at all times relevant hereto was, a United States citizen. Tuvia is the son of plaintiff Harry Hazen.

32.     Plaintiff Moshe Yosef Hazen is, and at all times relevant hereto was, a United States citizen. Moshe is the son of plaintiff Harry Hazen.

33.     Plaintiff Michael Haim Hazen is, and at all times relevant hereto was, a United States citizen. Michael is the son of plaintiff Harry Hazen.

34.     Plaintiff Eliezer Simcha Hazen is, and at all times relevant hereto was, a United States citizen. Eliezer is the son of plaintiff Harry Hazen.

35.     Plaintiff Betzalel Zvi Hazen is, and at all times relevant hereto was, a United States citizen. Betzalel Zvi is the son of plaintiff Harry Hazen.

36.     Plaintiff A.D.H. is, and at all times relevant hereto was, a United States citizen. A.D.H. is the son of plaintiff Harry Hazen.

37.     Plaintiff A.P.H. is, and at all times relevant hereto was, a United States citizen. A.P.H. is the son of plaintiff Harry Hazen.

38.     Plaintiff C.S.H. is, and at all times relevant hereto was, a United States citizen. C.S.H. is the son of plaintiff Harry Hazen.

39.     Plaintiff P.S.H. is, and at all times relevant hereto was, a United States citizen. P.S.H. is the son of plaintiff Harry Hazen.

40.     Plaintiff S.H. is, and at all times relevant hereto was, a United States citizen. S.H. is the daughter of plaintiff Harry Hazen.

41.     Plaintiff S.Y.H. is, and at all times relevant hereto was, a United States citizen. S.Y.H. is the son of plaintiff Harry Hazen.

42.     Plaintiff Y.H. is, and at all times relevant hereto was, a United States citizen. Y.H. is the son of plaintiff Harry Hazen.

43.     Plaintiff, Hen Rachel Hoogi is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack.

8

44.     Plaintiff, Inbal Lapid is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack with her then-partner, now-husband, Raz Nisim.

45.     Plaintiff, Raz Nisim, was the partner of Plaintiff, Inbal Lapid and is now married to her. Raz Nisim was present at the scene of the Attack with Inbal Lapid.

46.     Plaintiff, Smadar Lapid is the mother of plaintiff Inbal Lapid.

47.     Plaintiff, Gal Lapid is, and at all times relevant hereto was, a United States citizen. Gal is the brother of plaintiff Inbal Lapid.

48.     Plaintiff, Adiron ("Adi") Levy is, and at all times relevant hereto was, a United States citizen. Adi is the father of Gal Levy who was shot by Hamas terrorists and suffered severe injuries.

49.     Plaintiff, Astar Moshe is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack.

50.     Plaintiff, Shlomo Tobi is the partner of Plaintiff Astar Moshe. They have a child together, and share a relationship that is the functional equivalent of marriage.

51.      Plaintiff, Adiel Ravid is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack.  He is also the brother of plaintiff Raz Moshe Ravid.

52.     Plaintiff, Raz Moshe Ravid is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack. He is also the brother of plaintiff Adiel Ravid.

53.     Plaintiff, Leah Shlomo Ravid is, and at all times relevant hereto was, a United States citizen. Leah is the mother of plaintiffs Adiel and Raz Ravid.

54.     Plaintiff, Avishay Ravid is, and at all times relevant hereto was, a United States citizen. Avishay is the father of plaintiffs Adiel and Raz Ravid.

55.     Plaintiff, Efraim Rosenfeld is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack. Efraim Rosenfeld brings this action individually and as parent and legal guardian of his minor child, A.R.

56.     Plaintiff, A.R. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack.

57.     Plaintiff, Eitan Sagron is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack. Eitan Sagron brings this action individually and as parent and legal guardian of his minor child, A.S.

58.     Plaintiff, A.S. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the Attack.

59.     Plaintiff, Shimrit Sagron is the wife of Plaintiff Eitan Sagron and the mother of Plaintiff A.S. and was present at the scene of the Attack. Shimrit Sagron brings this action individually and as parent and legal guardian of her minor child, A.S.

60.     Plaintiff, Shani Anna Silverman is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with her husband, Amos Teshuva and her children A.T. and U.T. Shani Silverman brings this action individually and as parent and legal guardian of her minor children, A.T. and U.T.

61.     Plaintiff, Amos Teshuva was present at the scene of the attack with his wife, Plaintiff Shani Silverman and their children A.T. and U.T. Amos Teshuva brings this action individually and as parent and legal guardian of his minor children, A.T. and U.T.

62.    Plaintiff, A.T. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with her parents, Shani Silverman and Amos Teshuva, and her brother, U.T.

63.    Plaintiff, U.T. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with his parents, Shani Silverman and Amos Teshuva, and his sister, A.T.

64.    Plaintiff, Alon Lankri is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with his wife, Avital Ben-Dror Lankri and his children Y.L. and L.L. Alon Lankri brings this action individually and as parent and legal guardian of his minor children, Y.L. and L.L.

65.    Plaintiff, Avital Ben-Dror Lankri was present at the scene of the attack with her husband, Alon Lankri and her children Y.L. and L.L. Avital Ben-Dror Lankri brings this action individually and as parent and legal guardian of her minor children, Y.L. and L.L.

66.    Plaintiff, Y.L. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with his parents, Alon Lankri and Avital Ben-Dror Lankri, and his sister, L.L.

67.    Plaintiff, L.L. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with her parents, Alon Lankri and Avital Ben-Dror Lankri, and her brother, Y.L.

68.    Plaintiff, Nechama Shor is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with her husband, Daniel Shor and their children

C.S.S. and S.S.S. Nechama Shor brings this action individually and as parent and legal guardian of her minor children, C.S.S. and S.S.S.

69.    Plaintiff, Daniel Shor was present at the scene of the attack with his wife, Nechama Shor and their children C.S.S. and S.S.S. Daniel Shor brings this action individually and as parent and legal guardian of his minor children, C.S.S. and S.S.S.

70.    Plaintiff, C.S.S. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with her parents, Nechama Shor and Daniel Shor, and her brother, S.S.S.

71.    Plaintiff, S.S.S. is, and at all times relevant hereto was, a United States citizen, and was present at the scene of the attack with his parents, Nechama Shor and Daniel Shor, and his sister, C.S.S.

72.    Defendant is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)), as continued pursuant to 50 U.S.C. § 4826.

73.    Syria conspired with Hamas and provided material support and resources for the commission of acts of extrajudicial killing, hostage taking, and torture within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officers, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

**FACTS**

**A. The October 7, 2023 Terrorist Attack.**

74.      At approximately 6:30 am, on Saturday, October 7, 2023, which was both the Jewish Sabbath and the holiday of *Shemini Atzeret*, Hamas launched a massive, coordinated terrorist attack against Israel and its population.

75.      Prior to October 7, 2023, Hamas, Syria, and others, planned, conspired, and made preparations to carry out the Attack.

76.      In the opening minutes of the Attack, Hamas fired more than 3,000 rockets into Israel, while terrorists from Hamas's elite, Nukhba unit breached the 40-mile border fence separating Israel from Gaza.

77.      Hamas rained rocket fire on Israeli cities, towns and other civilian population centers. Longer range rockets reached as far as the heavily populated areas around Jerusalem, Tel Aviv, and all along the Mediterranean Coast. Communities in southern Israel close to the Gaza border were hit with heavy concentrations of Hamas rocket fire.

78.      The barrages of Hamas projectiles persisted throughout the day and into the following days and weeks.

79.      Meanwhile, during the opening barrage, an estimated 3,000 Hamas terrorists streamed through breaches in the border fence rampaging into towns, villages, and other communities along the border, killing, raping, torturing, and abducting innumerable innocent victims, including infants and children.

80.      Once inside Israel, Hamas terrorists murdered more than 1200 people from at least 40 different nationalities (including Americans). Hamas forcefully took more than 240 hostages to

and dispersed them to secret locations throughout Gaza. A still-unknown number were murdered in Israel only to have their bodies seized by their Hamas murderers and taken to Gaza.

81.     The Hamas terrorists infiltrated several miles into Israel, reaching as far as the town of Ofakim, where they murdered dozens of civilians.

82.     The brunt of the Hamas attack was felt in the border communities. The kibbutz of Be'eri, which sits approximately 2.5 miles from the Gaza border, was literally decimated, with 10% of its population murdered in the Attack. In Be'eri and in other border communities such as Kissufim, Zikim, Sderot, Kfar Aza, Nir Oz, and Nachal Oz, Hamas terrorists ruthlessly murdered, tortured, and abducted hundreds of civilians, including children and babies.

83.     The town of Sderot came under extremely heavy Hamas rocket fire.

84.     The Hamas terrorists overran Sderot, shooting civilians in the streets. Sderot residents were ordered to remain in their homes and safe rooms while the terrorists took control of the police station. By the end of the day, Hamas killed 50 civilians and 20 police officers in Sderot.

85.     The Israeli security forces did not regain control of Sderot until the following day after a 20-hour battle. Even then, doubts remained as to whether terrorists remained in the town.

86.     On October 8, 2023, as the Attack continued, Hamas fired approximately 100 additional rockets towards Sderot. Throughout, residents were trapped in their homes and shelters.

87.     Meanwhile, at a make-shift campground outside of Kibbutz Reim, the Supernova Music Festival ("Nova Festival"), a weekend-long music festival was underway. Many participants camped out at the festival site.

88.     As the Attack unfolded, Hamas terrorists driving motorcycles, vans, trucks, and even motorized paragliders, surrounded and invaded the Nova Festival. They opened fire on the

party-goers and blocked the access roads preventing many from escaping. Several victims were trapped in a traffic jam caused when the terrorist blocked the roads. The terrorists shot and killed numerous people in their vehicles and burned others alive.

89.     The terrorists raped and gang raped countless women at the Nova Festival (as they did in other locations). Most of the rape victims were also murdered, some during the rape; many had their bodies mutilated. The horrific acts of sexual violence against men and women were confirmed by eye-witness survivors and well as emergency responders, including those from the ZAKA volunteer organization, who arrived at the scene to find the naked, dead, mutilated bodies of women and men, including some who were naked from the waist down.

90.     Some of the festival participants attempted to flee by car or foot through the surrounding fields and orchards. The terrorists hunted down those who had escaped, killing many in their cars, shelters, and other hiding places.

91.     More than 360 of those murdered during the Attack, and approximately 40 of the hostages taken in the Attack were young people attending the Nova Festival.

92.     Hamas terrorists took custody or physical control over many victims and carried out some of the most brutal acts of physical, sexual, and emotional torture conceivable.

93.     Hamas terrorists deliberately took steps to sadistically maximize the pain and humiliation of as many victims as possible.

94.     Hamas terrorists dismembered and burned victims alive.

95.     Hamas terrorists sliced off the breasts, genitals, and other body parts of some of the victims—while victims were still alive. Other victims were shot in their genitals.

96.     In many instances Hamas terrorists carrying out their acts of savagery in front of the victims' family members and friends, who were forced to watch the torture of their loved ones.

97.     Many of Hamas's acts of murder, torture, rape, and hostage-taking were filmed by the terrorists themselves using Go-Pro and similar digital cameras carried during the Attack.

98.     In some instances, the terrorists used their victims' own cell phones to video the atrocities, and share the videos on the victims' social media accounts to ensure that even those not present would suffer unimaginable pain and distress from witnessing the horrors inflicted on their loved ones.

99.     Hamas terrorists abducted more than 240 people from 29 different countries, and brought them back to Gaza, where they continued to torture and rape many of the hostages.

100.    Hamas explicitly used, and continues to use, the hostages as bargaining chips to compel Israel to release Hamas terrorists held in Israeli prisons, to reduce its attacks against Hamas terrorists and terror bases, and to achieve other strategic goals.

101.    Hamas has also used, and continues to use, the hostages to compel other countries and third parties, including the United States, to take action that would be beneficial to Hamas, and to extract other concessions that would benefit Hamas.

102.    Hamas has explicitly and implicitly conditioned the release of some or all of the hostages upon Israel, the United States, and other countries and third parties releasing Palestinian prisoners and providing Hamas with other concessions.

103.    Since the Attack, families of some hostages have received threatening messages and calls, some originating from the cell phones of the hostages themselves, in which the purported captors demanded ransoms and made coercive threats. One message threatened relatives that if

they did not engage in the struggle (to pressure the Israeli government to enter a ceasefire) they would not see their loved ones return.

104.    As of this date, more than 100 hostages remain in the hands of their terrorist captors. Many are rumored to have been killed by their captors. However, these rumors cannot be confirmed because Hamas refuses to allow the International Committee of the Red Cross or other third parties to visit the hostages. Hamas also refuses to provide other evidence that any of the hostages remain alive.

105.    Reports from released or rescued hostages confirm that the Hamas continues to torture, rape, and enslave remaining hostages.

106.    At least 30 United States citizens were killed in the Attack—and at least 10 Americans are presumed to have been taken hostage. Many bodies of those killed were burned or mutilated beyond recognition, and therefore, have not yet been identified.

107.    In December, 2023, the White House confirmed that at least eight United States citizens were still being held hostage in Gaza[1].

108.    During the first days of the Attack, some Hamas terrorists succeeded in seizing positions up to 15 miles into Israel, and holding their ground for several days. During this time Hamas terrorists continued their killing spree.

109.    Meanwhile, from Gaza, Hamas continued to fire missiles and rockets into Israel, targeting civilian population centers.

---

[1] On or about August 30, 2024 the Israel Defense Forces ("IDF") recovered the body of American, Hersh Goldberg-Polin, one of the eight U.S. citizen hostages then remaining in Hamas captivity. Hamas terrorists executed Goldberg-Polin and five other hostages to prevent their rescue by the IDF.

110.    On October 7, 2023, 22-year-old Ayelet Arnin was enjoying the Nova Festival with friends when Hamas attacked. She escaped the Nova grounds by car and found refuge nearby in a bomb shelter in Kibbutz Reim. Hamas terrorists occupied Reim, broke open the shelter and attacked those hiding inside. Ayelet was killed by a Hamas grenade and gunshots.

111.    Plaintiffs Mordechai Artzi, Tamara Even Yaacobi, Natan Artzi, Yemima Betzalel, Niv Cohen, Hen Rachel Hoogi, Inbal Lapid, Raz Nisim, Astar Moshe, Adiel Ravid, Raz Moshe Ravid, and Shlomo Tobi (collectively "Nova Victims") were all present at the Nova Festival during the Attack.

112.    The Nova Victims all came under intense rocket fire and were shot at and chased by Hamas terrorists who infiltrated the Nova Festival grounds. Some fled the Nova grounds on foot and/or by car, while still under fire from the terrorists.

113.    The Nova Victims experienced and witnessed some of the most horrific acts of violence imaginable. Hamas terrorists murdered more than 350 people at the Nova Festival. The Nova Victims feared for their lives and the lives of their immediate family members as they heard shooting and read text messages about the horrors that were unfolding around them and throughout the country. All Nova Victims suffered severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

114.    Plaintiffs A.R., Ephraim Rosenfeld, Eitan Sagron, Shimrit Sagron, A.S., A.B., Bat-El Bluestein, Fabien Bluestein, I.B., O.A.B., Nechama Shor, Daniel Shor, C.S.S., and S.S.S., are or were at the time of the Attack, residents of Sderot (collectively "Sderot Victims"). The Sderot Victims all came under intense rocket fire. Later in the day, Hamas terrorists roamed the streets of Sderot shooting anyone they encountered. Hamas terrorists murdered at least 70 people in Sderot.

18

The Sderot Victims feared for their lives and the lives of their immediate family members as they heard shooting and read text messages about the horrors that were unfolding outside.

115.    The Sderot Victims experienced and witnessed horrific acts of violence by the Hamas terrorists. The Sderot Victims were forced to evacuate their homes for several months. Each of the Sderot Victims suffered severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

116.    Plaintiffs Yoshua Hai ("Shuki") Danino, Tal Peer, A.D.P.1, and A.D.P. 2, were at their home in Kissufim, Israel, near the Gaza border when Hamas started its attack by unleashing non-stop rocket fire into Kissufim. Shuki, Tal, and their two young children locked themselves in a reinforced safe room. The Danino-Peer family feared for their lives as they heard shooting and read text messages about the horrors that were unfolding outside. Hamas terrorists murdered more than 20 people in Kissufim. The Danino-Peer family witnessed horrific acts of violence by the Hamas terrorists. The Danino-Peer family were forced to evacuate their home for several months. Shuki, Tal, and their children A.D.P.1 and A.D.P.2 suffered severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

117.    Plaintiffs Shani Anna Silverman ("Silverman"), Amos Teshuva, A.T. and U.T. were at home in Zikim on the Gaza border when Zikim came under intense rocket fire. The Silverman-Teshuva family feared for their lives and the lives of their immediate family members as they heard shooting and read text messages about the unfolding horrors. Hamas terrorists murdered more than 50 people in and in the immediate vicinity of Zikim. Each member of the Silverman-Teshuva family witnessed horrific acts of violence by the Hamas terrorists and were

forced to evacuate their home for several months. They each suffered severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

118.    Plaintiff Harry Brian ("Eli") Hazen is, and at all times relevant hereto was, a United States citizen. Eli is a volunteer emergency responder for the ZAKA emergency search and rescue organization. He is also a medic and a volunteer fire fighter. On October 7, 2023, at great risk to his life, Eli responded to the Attack and was exposed to the most gruesome scenes of brutality imaginable while under constant Hamas rocket fire. Eli feared for his life as he witnessed the violence, heard shooting, and read text messages about the unfolding horrors nearby. Eli suffered severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

119.    Plaintiffs, Alon Lankri, Avital Ben-Dror Lankri, Y.L., and L.L. were at home in Ashkelon a few miles north of the Gaza border when Ashkelon came under intense rocket and missile fire. The Lankri family feared for their lives and the lives of their immediate family members and fled their home into a nearby bomb shelter. They heard continuous sirens and felt the ground shake from multiple nearby explosions. After sheltering for hours from the continuous rocket and missile fire the Lankri family emerged from the shelter and found their home damaged from the rockets and missiles. They fled Ashkelon and drove to Avital's parents' home in Ness Ziona, where they have remained until the present. At least 4 people in Ashkelon were killed from the Hamas rocket and missile barrages.

120.    Each member of the Lankri family witnessed horrific acts of violence by the Hamas terrorists and were forced to evacuate their home and move to another city. They each suffered

severe physical and/or emotional injuries as well as pecuniary loss during and as a result of the Attack.

121.    The remaining plaintiffs are the survivors of Ayelet Arnin and immediate family members of the other plaintiffs (collectively "Family Member Plaintiffs"). Each of the Family Member Plaintiffs suffered severe emotional distress during and as a result of the Attack.

**B.  Hamas is a Radical Terrorist Organization Publicly and Proudly Executing Attacks.**

122.    Hamas is a radical terrorist organization which openly declares its goals of creating an Islamic state covering the entire territory of Israel, the West Bank, and the Gaza Strip, as well as the destruction of the State of Israel and the murder or expulsion of its Jewish residents.

123.    Hamas is extremely anti-American and anti-Western.

124.    Hamas is formally committed to the destruction of the State of Israel, a sovereign state, and it rejects achieving a peaceful resolution between Israel and the Palestinians.

125.    Indeed, since October 7, 2023, several senior Hamas members have claimed responsibility for the Attack and hostage-taking, ratified the Attack and hostage-taking, and reiterated their commitment to the eradication of the State of Israel and its Jewish population.

126.    Hamas politburo member, Ghazi Hamad proclaimed, in an interview on Lebanese television, that Hamas will repeat its violence of October 7, 2023, many times, until Israel is completely annihilated.[2]

---

[2] James Cleverly, Foreign Secretary of the United Kingdom, shared on his X (Twitter) account a video showing excerpts of the Gahzi Hamad interview. The Foreign Secretary wrote, "How can there be peace when Hamas are committed to the eradication of Israel? This is an official from Hamas committing to repeat the atrocities from 07/10 again and again." See https://x.com/JamesCleverly/status/1719718109739688143?s=20, last visited June 9, 2024.

127.    Hamas has proclaimed it took hostages to pressure the Israeli and American governments, consistent with its other terrorist activities and its total rejection of peace with Israel.

128.    Hamas has explicitly used, and continues to use, the hostages as bargaining chips to compel Israel to release Hamas terrorists held in Israeli prisons, to reduce its attacks against Hamas terrorists and terror bases, and to achieve other strategic goals.

129.    Hamas has also used, and continues to use, the hostages to compel other countries and third parties, including the United States, to take action that would be beneficial to Hamas, and to extract other concessions that would benefit Hamas.

130.    Hamas is committed to achieving its objectives by violent means, including acts of international terrorism. It seeks to achieve these goals by carrying out terrorist attacks against innocents in Israel, the West Bank, and the Gaza Strip.

131.    Hamas proudly and openly acknowledges it uses terrorism to achieve its political goals. Hamas uses terrorism to coerce, intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

132.    Hamas has carried out hundreds of terrorist attacks intentionally injuring and killing American citizens through bombings, shootings, stabbings, rocket attacks, the launching of incendiary terror devices, hostage takings, torture, and a wide variety of other terror activities. Hamas not only encourages these attacks, but is proud of the attackers, who become celebrated martyrs who have received incentives and rewards for having committed acts of murder and other acts of international terror.

22

133.    Continuously since 1995, and at all times relevant hereto, Hamas has been designated by the United States as a Specially Designated Terrorist ("SDT").

134.    Continuously since 1997 and at all times relevant hereto, Hamas has been listed by the U.S. Department of State as a Foreign Terrorist organization ("FTO").

135.    Continuously since 2001, and at all times relevant hereto, Hamas has been listed pursuant to Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT").

136.    Syria is aware of the aforementioned designations.

137.    Since not later than 2003, United States courts have reached and published numerous decisions finding Hamas responsible for terrorist attacks in which U.S. citizens were killed and injured. Syria is aware of these decisions and findings.

138.    In August and September 2005, Israel unilaterally withdrew from the Gaza Strip, leaving the territory under the control of the Palestinian Authority.

139.    In 2006, the Palestinian Authority held parliamentary elections in which Hamas won a plurality of the votes. Hamas was then included in the Palestinian governing coalition, but a violent power struggle ensued between the previously-dominant Fatah faction and Hamas.

140.    By June 2007, Hamas had taken control of the entire Gaza Strip.

141.    Since the 2007 take-over, and until and including October 7, 2023 and beyond, Hamas was the *de facto* ruling power of Gaza and exercised control over Gaza's population and all governing institutions.

142.    Hamas built Gaza into an enormous terror  base.

143.    Hamas commanded a vast terrorist armed force including approximately 40,000 fighters, tens of thousands of rockets and medium-range missiles, and a massive array/supply of

small arms, mortars, crew-served weapons, anti-tank missiles, anti-aircraft guns, mines, improvised explosive devices, and other weapons supplies.

144.    During its rule of Gaza, Hamas constructed approximately 400 miles of military tunnels. Some of Hamas's terror tunnels were built up to 200 feet below the ground—and some of Hamas's tunnels were so large that cars could be driven through them.

145.    Hamas planned and prepared for the October 7, 2023, Attack for years.

146.    In 2019, Hamas organized weekly "protests" along the Israel-Gaza security fence. During these riots, Hamas terrorists threw explosive devices at the fence and launched incendiary balloons and other explosives towards Israel.

147.    Also in 2019, Hamas launched more than 1,200 rockets and mortars towards Israel, killing 10 civilians, forcing Israelis to hide in shelters and to close schools and businesses.

148.    These attacks were not only intended to cause death and destruction. They were also part of a Hamas plan to test the Israeli border defenses to identify weak spots, in preparation for a future invasion.

149.    In the following years, Hamas continued it rocket fire and violent demonstrations along the border with Israel. The demonstrations included the use of explosive devices and live fire aimed at Israelis. On several occasions, Hamas attempted to infiltrate the border. In an August 21, 2001 incident a Hamas gunman approached an Israeli border post and shot and killed an Israeli soldier at point-blank range.

150.    Hamas built fake "towns" in Gaza to resemble Israeli towns and trained terrorist forces to overpower Israeli defenses and occupy the towns.

151.    In this way, Hamas built up its terrorist infrastructure and prepared for an earth-shattering attack surpassing any Palestinian terrorist attack in the past

**C. Syria Conspired with and Provided Hamas with Vast Amounts of Material Support for Terrorism.**

152.    For decades, Syria has engaged in and materially supported anti-Israel and anti-American terror attacks, including specifically attacks by Hamas and Hezbollah in Israel. As set forth herein, Syria provided material support and resources for the October 7 Attack.

153.    During all periods relevant to this suit, it has been the continuous and official policy of Syria to use terrorism against the United States and its allies, including Israel, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, including Hamas, Syria enables them to carry out attacks against the United States and Israel, and advance Syrian interests around the world. Syria exploits its support for terrorist organizations to obtain leverage with other countries, either "punishing" them or obtaining concessions from them.

154.    Additionally, Syria utilizes its support of international terrorism to attempt to: (a) intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically, and politically; and (b) intimidate and influence the Israeli government and public and thereby seek to bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

155.    Towards these ends, Syria has provided massive amounts of material support and resources to Hamas in conspiracy with the Islamic Republic of Iran ("Iran"), the Hezbollah terrorist

organization, Hamas and other terrorist organizations and actors, all of which shares Syria's violently anti-American and anti-Israel ideology.

156.    During the period relevant hereto, Syria provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, torture, and hostage taking, including the Terrorist Attack.

157.    Such support was provided continuously, routinely, and in furtherance and as implementation of a specific policy and practice established and maintained by Syria, in order to assist Hamas to achieve goals shared by Iran. These goals included terrorizing the Jewish civilian population in Israel, weakening Israel's economy, social fabric, and military strength and preparedness, and harming Israel's allies and supporters, especially the United States.

158.    Syria has been ruled by dictator, Bashar Al-Assad since 2000.

159.    Before Bashar assumed control, his father, Hafez Al-Assad ruled over Syria since 1970.

160.    The Assad family and key allies from Syria's minority Alawite sect control most key positions in the Syrian government, military, and intelligence and security services.

161.    President Al-Assad and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

162.    The more than dozen Syrian security services answer directly to Bashar Al-Assad and his brother, General Maher Al-Assad, commander of the Syrian Republican Guard.

163.    Syria provided the material support and resources through its security and intelligence agencies.

164.    Syria provided Hamas with material support and resources through officers, employees, and agents of Syria  (collectively below: "Syrian Officials") who worked in or with the Syrian government, military, security and intelligence agencies.

165.    In addition, at all times relevant hereto, Syria and the Syrian Officials provided Hamas with the material support and resources directly and by and through the agency of, and in conspiracy with, the Hezbollah terrorist organization and other terrorist groups and terrorist operatives, which and who received material support and resources from Iran, Syria, and the Syrian Officials for the purpose of providing material support and resources to Hamas, and which acted in concert with Syria and the Syrian Officials for that purpose. The Syrian Officials and the Syrian Agents are collectively referred to below as Syria's "Officials and Agents."

166.    Syria provided material support for Hamas and facilitated other co-conspirators' provision of material support for Hamas from Syrian and Lebanese territory.

167.    This provision of material support for Hamas could not have been accomplished without the express authorization of the Syrian government, Syrian Officials, and Syrian Officials and Agents.

168.    The material support and resources provided to Hamas by Syria and its Officials and Agents in the years immediately prior to the Attack for the purpose of facilitating acts of extrajudicial killing, torture, kidnapping, and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; provision of military-

grade explosives, military firearms and other weapons and matériel to Hamas; provision of access to training bases and military facilities in which terrorist training was provided to Hamas and its operatives; provision to Hamas and its leaders and operatives of safe haven and refuge from capture; provision to Hamas of electronic communications equipment and access; provision to Hamas of financial services, including banking and wire transfer services; and provision to Hamas of means of transportation, including transporting and facilitating the transportation of Iranian-provided weapons to or for the use of Hamas, in a manner that enabled them to avoid detection and carry out further terrorist attacks.

169.     At all times relevant hereto, and since at the latest 1991, Hamas has maintained a presence in Syria.

170.     In 1993, Hamas joined the Damascus-based Alliance of Palestinian Forces.

171.     In the mid-1990s Hamas's military wing, the Izz al-Din al Qassam Brigades, established an operational headquarters in Damascus, Syria. Hamas used its offices in Syria for strategic planning and command and control. Hamas also used its Damascus base to transfer funds directly to its operatives in the West Bank and Gaza. Syria enabled Hamas to operate freely in Syrian-controlled Lebanon and to openly recruit Palestinian refugees there and to undergo joint training with Hezbollah.

172.     Qasem Soleimani became the commander of the IRGC-QF in 1997. In this capacity, he had primary responsibility for building Iran's network of terrorist proxies (what Iran refers to as the "Axis of Resistance"). As the leader of the IRGC-QF, he supervised the coordination of terrorist activities among various Palestinian terrorist groups, and supporters of those terrorist groups, including Syria.

173.    Thus, a terrorist conspiracy was established and continues to this day, with Iran at the hub and having the violent annihilation of Israel as its goal. Hamas is a key player in this conspiracy.

174.    In 2009, during a round of fighting between Hamas and Israel, Hamas and other Palestinian terrorist groups established a joint war room in Damascus, Syria. According to the former Hamas leader Ismail Haniyeh, Soleimani was present in the Damascus war room overseeing and coordinating the fighting against Israel.

175.    Soleimani initiated a program to provide Hamas with the knowledge and materials necessary to create its own rocket and missile production facilities. Soleimani coordinated these activities with Syrian officials, and much of the training was conducted in Syria.

176.    In June 2007, the Hamas leadership, who were then based in Damascus, orchestrated the Hamas takeover of Gaza from the Palestinian Authority.

177.    In 2012, the Hamas-Syria relationship temporarily cooled due to Hamas's refusal to support the Assad regime during the Syrian civil war. However, because Hamas's position displeased Iran, Hamas changed its position and gradually Syria resumed its support for Hamas.

178.    In November 2018, the Treasury Department uncovered a complex "oil-for-terror" network that benefited Hamas, among others. The scheme involved the shipment of Iranian oil to Syria, which distributed hundreds of millions of U.S. dollars in profits to the IRGC. The IRGC, in turn, sent the funds to Hezbollah and Hamas.

179.    In October 2022, Syria hosted a Hamas delegation in Syria and publicly reaffirmed its support for Hamas. Syrian President Bashar al-Assad ("Assad") told the Hamas delegation, which included Hamas leader Ismail Haniyeh, that: "despite the war that Syria is being subjected

to, it did not change its stance of backing resistance by all forms." Assad announced that as "everyone knew before and after the war," Syria "will not change and will continue as a supporter of resistance." Hamas chief of Arab relations Khalil al-Hayya told reporters in Damascus that: "This is a glorious and important day, in which we come back to our dear Syria to resume joint work."

180.    Syria materially contributed to Hamas's massive military buildup that preceded the October 7, 2023 Attacks. As reported by Al Jazeerah in December 2023, Hamas leader Ismail Haniyeh told Al Jazeera that part of Hamas's long-range rocket arsenal came from Syria.

181.    On October 7, 2023, the Assad regime issued a statement immediately praising "Operation Al-Aqsa Flood," the name that Hamas gave to its terror attack of that day. The statement indicated that: "Syria raises its head high in honor of the martyrs of the Palestinian revolution and the heroes who planned and achieved the Al-Aqsa Flood operation."

182.    Syria also provided material support, aided and abetted the October 7 Terrorist Attacks by supplying Hamas with Captagon, a synthetic amphetamine-type drug.

183.    The Hamas terrorists who perpetrated the October 7 Attacks were reportedly found to be under the influence of Captagon. Upon information and belief, Hamas handlers provided Captagon to the invading terrorists because the drug promotes feelings of rage, irritability, and impatience, and encouraged terrorists to murder and torture their victims. Syria produces the vast majority of Captagon, and the Syrian government is reportedly responsible for its production and distribution, including to Hamas.

184.    Syria also used Captagon sales to fund the terrorist activities including those of Hamas.

185.    At all times relevant hereto, in coordination with Iran and its terror proxies, including Hezbollah and Hamas, Syria has been a leading logistical hub for the provision of Iranian military materiel to Hamas.

186.    At all times relevant hereto, in coordination with Iran and its terror proxies, including Hezbollah, Syria provided Hamas with training bases and facilities, both in Syria and in areas of Lebanon under Syrian control.

187.    Syria continues to provide operational and logistical support for Hamas militants in the West Bank and Gaza, safe haven for Hamas leadership in Damascus, training for Hamas militants, safe passage and transit across Syrian territory, and the provision of financial and military assistance. Syria provides this material support as a matter of state policy.

188.    Syrian financing and logistical support enabled Hamas to send a number of its agents abroad for training by Syrian, Iranian, and Hizbollah agents. These Hamas agents would then return to the West Bank or Gaza and train others.

189.    Syria and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, torture, kidnapping, including the Attack. Syria and its Officials and Agents did so with actual knowledge Hamas had killed, tortured, kidnapped, and injured numerous U.S. citizens in terrorist attacks and that additional U.S. citizens and other innocent civilians would be killed, tortured, kidnapped, and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

190.    Syria and its Officials and Agents knowingly and willingly conspired, agreed, and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, torture, and hostage taking, including the Terrorist Attack. Syria and its Officials and Agents did so with actual knowledge that Hamas had killed, tortured, kidnapped, and injured numerous U.S. citizens and that additional U.S. citizens and other innocents would be killed, tortured, taken hostage, and injured as a result of their conspiracy with Hamas.

191.    At all times relevant hereto, Syrian agencies, instrumentalities, and officers performed actions on behalf of Syria, in furtherance of the interests and policy of Syria and within the scope of their agency and office, within the meaning of 28 U.S.C. §1605A(a)(1) and 28 U.S.C. §1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that the Syrian agencies, instrumentalities, and officers implemented and acted as conduits and instrumentalities for Syria's provision of funds, terrorist training, and other material support and resources to Hamas for the commission of acts of extrajudicial killing, torture, and hostage taking including the Attack.

192.    Syria authorized, ratified, and approved the actions of its agencies, instrumentalities, and officers described herein, and is therefore both directly and vicariously liable for those actions.

193.    At all relevant times, Syria's Officials and Agents were officers, employees, and/or agents of Syria, and performed actions on behalf of Syria, in furtherance of the interests and policy of Syria, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Attack and harm to the plaintiffs herein, in that Syria's Officials and Agents authorized, planned and caused the provision of funds, terrorist

32

training and other material support and resources by Syria to Hamas for the commission of acts of extrajudicial killing, torture, and hostage taking, including the murder of Ayelet Arnin.

194.    Syria's long-standing and extensive support for Hamas terrorism has been repeatedly recognized by courts in this District, which have held Syria liable for Hamas attacks in Israel. *See, e.g.*, *Fuld v. Islamic Republic of Iran*, No. 20-CV-2444-RCL, 2024 WL 1328790 at *4-6 (D.D.C. Mar. 28, 2024); *Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2022 WL 3354719, at *7 (D.D.C. Aug. 9, 2022); *Borochov v. Islamic Republic of Iran, et al.*, 589 F. Supp. 3d 15, 26 (D.D.C. 2022) (vacated and remanded on other grounds); *Henkin v. Islamic Republic of Iran*, 2021 WL 2914036, at *2 (D.D.C. July 12, 2021); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 341 (D.D.C. 2020); *Estate of Steinberg v. Islamic Republic of Iran, No. 17-cv-1910 (RCL), 2019 WL 6117722* at * 8 *(D.D.C. Nov. 18, 2019)*; *Roth v. Syrian Arab Republic*, No. 1-14-cv-01946-RCL, 2018 WL 4680270, at *8 (D.D.C. Sept. 28, 2018); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71-72 (D.D.C. 2017).

195.    Thus, Hamas's practice of carrying out terrorist attacks, and its multiple designations as a terrorist organization, were and are well known to the public at large, including to Syria. With knowledge of Hamas's terrorist goals and with the deliberate intent to further those goals, Syria conspired with and provided material support to Hamas.

196.    Syria authorized, ratified and approved the actions described herein of its Officials and Agents, and is therefore directly and vicariously liable for those actions.

197.    The duration, quantity, and quality Syria's material support, greatly contributed to Hamas's ability to carry out terrorist attacks. Hamas could not have carried out the murderous Attack without Syria's support and sponsorship.

198.    Syria and its agents knew and intended that Hamas carry out further terrorist attacks and continued to support Hamas for that purpose.

199.    As a direct and proximate result of Syria's provision of material support to Hamas Syria hundreds of innocent people were killed and grievously injured by acts of terrorism committed by Hamas.

200.    Any and all conditions to commencement of this suit have been satisfied, waived, or are futile.

**FIRST COUNT**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**
**(All U.S. national plaintiffs)**

201.    The preceding allegations are incorporated by this reference as though fully set forth herein.

202.    Syria is a foreign state that, since 1979, has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

203.    Syria provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

204.    Syria conspired with Hamas to carry out the Terrorist Attack.

205.    Agencies, instrumentalities and/or offices of Syria they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all within the scope of their agency and office.

206.    Syria's Officials and Agents are officers, employees, and/or agents of Syria, and they provided the material support and resources which caused and facilitated the Terrorist Attack,

and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

207.    Hamas is, and was at the time of the Attack, an agent of Syria, and it carried out the Terrorist Attack while acting within the scope of its agency.

208.    The Terrorist Attack constituted an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

209.    The Terrorist Attack also constituted an act of torture within the meaning of 28 U.S.C. § 1605A.

210.    The Terrorist Attack also constituted an act of hostage taking within the meaning of 28 U.S.C. § 1605A.

211.    Ayelet Arnin and others were murdered in the Terrorist Attack.

212.    The death of Ayelet Arnin and the injuries suffered by all plaintiffs were caused by a willful and deliberate act of terror committed by Hamas, a Foreign Terrorist Organization, with the material aid and support of the Defendant Syria.

213.    Plaintiffs Mordechai Artzi, Tamara Even Yaacobi, Natan Artzi, Yemima Betzalel, Niv Cohen, Hen Rachel Hoogi, Inbal Lapid, Raz Nisim, Astar Moshe, Shlomo Tobi, Adiel Ravid, Raz Moshe Ravid, A.R., Ephraim Rosenfeld, Eitan Sagron, Shimrit Sagron, A.S., A.B., Bat-El Bluestein, Fabien Bluestein, I.B., O.A.B., Yoshua Hai Danino, Tal Peer, A.D.P.1, A.D.P.2, Shani Silverman, Amos Teshuva, A.T., U.T., Harry Brian Hazen, Alon Lankri, Avital Lankri, Y.L., L.L., Nechama Shor, Daniel Shor, C.S.S., and S.S.S. were all present at the scene of the Attack, were placed in extreme fear of immediate death or serious physical injury (for themselves and their

immediate family members), and witnessed the brutal Attack and the murder, maiming, and raping of other victims, among many other horrifying sights.

214.    Plaintiffs Mordechai Artzi, Tamara Even Yaacobi Natan Artzi, Yemima Betzalel, Niv Cohen, Hen Rachel Hoogi, Inbal Lapid, Raz Nisim, Astar Moshe, Shlomo Tobi, Adiel Ravid, Raz Moshe Ravid, A.R., Ephraim Rosenfeld, Eitan Sagron, Shimrit Sagron, A.S., A.B., Bat-El Bluestein, Fabien Bluestein, I.B., O.A.B., Yoshua Hai Danino, Tal Peer, A.D.P.1, A.D.P.2, Shani Silverman, Amos Teshuva, A.T., U.T., Harry Brian Hazen, Alon Lankri, Avital Lankri, Y.L., L.L., Nechama Shor, Daniel Shor, C.S.S., and S.S.S. each suffered severe harm as a result of the Terrorist Attack, including: physical injuries, severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

215.    The injuries suffered by the Plaintiffs who were present at the scene of the Attack also caused their immediate family members severe harm, including severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium and pecuniary loss and loss of income.

216.    Syria rendered material support to the activities of Hamas that resulted in the murder of Ayelet Arnin and the emotional and other injuries to each of the plaintiffs.

217.    Syria is therefore liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

218.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

219.    As a direct and proximate result of the willful, wrongful and intentional acts of the Defendant and of Hamas described herein, for which the Defendant is directly and vicariously liable, each of the U.S. national Plaintiffs have endured extreme mental anguish, death and/or physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their loved one, loss of income and other pecuniary loss, for which the Plaintiffs and each of them seek an award of damages and judgment against the Defendant, to the fullest extent of the law.

**SECOND COUNT**
**<u>WRONGFUL DEATH</u>**
**(Under the Law of the District of Columbia and Other Applicable Law)**
**(Estate of Ayelet Arnin and Deborah Hartston )**

220.    The preceding allegations are incorporated by this reference as though fully set forth herein.

221.    Syria, itself and/or through its officers, agents, employees and/or co-conspirators, willfully and deliberately caused, authorized, organized, planned, aided, abetted, induced, conspired to commit, provided material support for and executed the Terrorist Attack.

222.    Syria's behavior constituted a breach of legal duties to desist from causing, committing, aiding, abetting, authorizing, inducing, or conspiring to commit, acts of extrajudicial killing, and to refrain from intentionally, recklessly, or negligently causing the infliction of death, physical injuries or harm to persons such as the plaintiffs herein and their decedents.

223.    Syria's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Terrorist Attack and the death of Ayelet Arnin.

224.    At the time of her death, Ayelet Arnin was 22 years of age, enjoying good health, was industrious and in possession of all her faculties.

225.    The murder of Ayelet Arnin caused decedent, her estate, and her mother, plaintiff Deborah Hartston, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

226.    Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

227.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**THIRD COUNT**
**<u>SURVIVAL DAMAGES</u>**
**(Under the Law of the District of Columbia and Other Applicable Law)**
**(Estate of Ayelet Arnin)**

228.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

229.    The murder of Ayelet Arnin caused her and her estate severe injury, including pain and suffering, pecuniary loss and loss of income. From the beginning of the Attack until her death, Ayelet Arnin suffered great conscious pain, shock and physical and mental anguish.

230.    Syria is therefore liable to the Estate of Ayelet Arnin, for the full amount of decedent's damages, in such sums as may hereinafter be determined.

231.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

### FOURTH COUNT
### <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/ SOLATIUM</u>
### (Under the Law of the District of Columbia and Other Applicable Law)

232.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

233.    Syria's conduct was intentional, outrageous and dangerous to human life, and violates applicable criminal law and all international standards of civilized human conduct and common decency.

234.    Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

235.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

236.    Syria intended to, and did in fact, terrorize the decedent and the plaintiffs, and cause them severe emotional distress.

237.    The Attack caused each plaintiff to suffer severe emotional distress, extreme terror, mental anguish, and injury to their feelings.

238.    As a result of the Attack each plaintiff has been deprived of the services, society, consortium and solatium of their immediate family members who were victims of the Attack, and have suffered and will continue to suffer extreme terror, severe mental anguish, bereavement and grief, and injury to their feelings.

### FIFTH COUNT
### <u>ASSAULT AND BATTERY</u>
### (Under the Law of the District of Columbia,
### the Law of the State of Israel, and Other Applicable Law)

239.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

240.    Causes of action in tort in Israeli law are codified in the *Civil Wrongs Ordinance (New Version) - 1968*, (hereinafter "CWO"). The CWO provides that any person injured or harmed by the torts enumerated in the CWO is entitled to relief from the person liable or responsible for the tort.

241.    CWO § 23 creates a tort of Assault and Battery defined as the intentional use of any kind of force, directly or indirectly, against a person's body, in any manner, without that person's consent; or an attempt or threat, by act or gesture, to use force against a person's body, when the person making the attempt or threat can be reasonably assumed to be have the intent and ability to carry out the attempt or threat.

242.    The Attack was an intentional, nonconsensual use of force, directly or indirectly, against the bodies of the plaintiffs who were present at the scene of the Attack and constituted a battery on their persons under the law of the District of Columbia and under § 23 of the Israeli CWO.

243.    The Attack caused the plaintiffs who were present at the scene of the Attack imminent fear and apprehension of physical harm and death, and constituted an assault on their persons under the law of the District of Columbia and under § 23 of the Israeli CWO.

244.    The Terrorist Attack and the assault and battery on their persons, which were direct and proximate results of Syria's actions, caused the plaintiffs who were present at the scene of the Attack extreme fear, and profound mental anguish and trauma.

245.    Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

246.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

## SIXTH COUNT
## NEGLIGENCE
### (Under the law of the State of Israel)

247.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

248.    Section 35 of the Israeli CWO creates a tort of Negligence. CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

249.    CWO § 36 provides that the obligation stated in CWO § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

250.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

251.    Syria committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

252.    Syria acted "negligently" in connection with the Plaintiffs and their decedents, toward whom, in the circumstances described herein, Syria had an obligation not to act as it did. Syria was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the Plaintiffs were likely to be injured by Syria's acts and omissions described herein.

253.    Syria's behavior therefore constitutes Negligence under the CWO, and as a result of Syria's negligent behavior Ayelet Arnin was murdered and each of the remaining plaintiffs were severely injured, as set forth herein.

254.    Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

255.    Syria's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**SEVENTH COUNT**
**CIVIL CONSPIRACY**
**(Under the Law of the District of Columbia,**
**the Law of the State of Israel, and Other Applicable Law)**

256.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

257.    Syria knowingly and willingly conspired, agreed, and acted in concert with Hamas in a common plan and design to facilitate and cause acts of international terrorism, extrajudicial killing, torture, hostage taking, and personal injury including the Terrorist Attack.

258.    As a result of the Terrorist Attack caused, resulting from, and facilitated by Syria's conspiracy with Hamas, the plaintiffs suffered the damages enumerated herein.

259.    Civil conspiracy principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises, or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

260.    Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

## EIGHTH COUNT
## AIDING AND ABETTING
### (Under the Law of the District of Columbia,
### the Law of the State of Israel, and Other Applicable Law)

261.    The preceding paragraphs are incorporated by this reference as though fully set forth herein.

262.    Syria provided Hamas with material support and resources within the meaning of 28 U.S.C. §1605A, and other substantial aid and assistance, in order to aid, abet, facilitate, and cause the commission of acts of international terrorism, extrajudicial killing and personal injury including the Attack.

263.     As a result of the Attack caused, resulting from and facilitated by Syria's provision of material support and resources to, and other acts of aiding and abetting Hamas, the plaintiffs suffered the damages enumerated herein.

264.     Aiding and abetting principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises, or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

265.     Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

**NINTH COUNT**
**VICARIOUS LIABILITY/RESPONDEAT SUPERIOR**
**(Under the Law of the District of Columbia,**
**the Law of the State of Israel, and Other Applicable Law)**

266.     The preceding paragraphs are incorporated by this reference as though fully set forth herein.

267.     At all relevant times, the Syrian Officials and Agents were officers, employees, and agents of Syria, acting within the scope of their office, employment, and agency.

268.     The Syrian Officials and Agents engaged in the actions described herein within the scope of their office, employment, and agency and in furtherance of the interests of defendant Syria.

269.     Syria authorized, ratified, and/or condoned the actions described herein of the Syrian Officials and Agents.

270.     Therefore, Syria is vicariously liable for the acts of the Syrian Officials and Agents.

271.     Respondeat superior and vicarious liability principles are recognized in Israeli law in CWO §§ 13 and 14, providing an employer is liable for an act or omission committed by his employee, if the employer authorized or ratified the act or omission, or if the employee committed the act or omission in the course of his employment, and that a person who employs an agent for the performance of an act or a category of acts is liable for everything the agent does in the performance of that act or category of acts, and for the manner in which the agent performs them.

272.     Defendant Syria engaged Hamas as its agent to carry out terrorist attacks, including the Attack,  in order to achieve the goals shared by Syria and Hamas, such as terrorizing the Jewish civilian population in Israel, weakening Israel's economy, social fabric, and military strength and preparedness, and harming Israel's allies and supporters, especially the United States. The Attack was carried out by the Hamas in fulfillment, and within the scope, of that agency relationship.

273.     Syria is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

### TENTH COUNT
### PUNITIVE DAMAGES
**Under 28 U.S.C. § 1605A(c), the Law of the State of Israel, and Other Applicable Law**
**(on behalf of all Plaintiffs)**

274.     The preceding paragraphs are incorporated by this reference as though fully set forth herein.

275.     The actions of Syria, which has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since the 1970s are heinous in nature, politically motivated, and target the United States of America, its citizens, residents and visitors, thereby rendering the Defendant liable for the heinous Attack, and the emotional and other injuries

to each of the plaintiffs, thereby entitling each of the plaintiffs, to an award of damages as shall be determined at trial and in accordance with the laws of the United States and Israel.

276.    The acts of the Defendant carried out by its Officials and Agents as described above, were malicious, wilful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life, hostage taking, torture and other injuries as above described were intended as a result by the Defendant.

277.    Plaintiffs are victims of the acts of international terror committed by Hamas with the material support of Syria. In accordance with the provisions of 28 U.S.C §1605A(c), plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

278.    Israel's Law for Compensation of Terrorism Victims (Exemplary Damages), 5784-2024 (the "LCTR") provides that a defendant found civilly liable for a terrorist attack shall pay, in addition to any other compensation awarded to the plaintiff, punitive damages to victims and heirs of victims of the attack.

279.    The actions of Hamas, as set forth above, were intentional and malicious and in willful, wanton, and reckless disregard of the rights and physical well-being of each of the plaintiffs herein. The actions of Hamas and Syria were part of their ongoing and continuing campaign of terror committed against citizens of the United States and Israel in support of the political goals and aims of Hamas and Syria to reject peace with Israel, to oppose US foreign policy in the region, and to use terror as a means of destroying the State of Israel, consistent with the foreign policy positions of Syria, which is an avowed enemy of Israel and the United States.

280.    The acts of Hamas were facilitated through material support for terrorism provided by Syria. This Court has previously found Syria liable for the support of Hamas and other Foreign Terrorist Organizations.

281.    Notwithstanding said findings, Syria has continued to sponsor and support terror.

282.    Defendant must be punished by this Court for its acts of sponsorship of terror.

**WHEREFORE**, plaintiffs demand judgment as follows:

a.      Judgment against defendant Syria for compensatory damages in an amount to be determined by the Court, alleged to be not less than Five Hundred Million Dollars ($500,000,000);

b.      Judgment against defendant Syria for punitive damages in an amount to be determined by the Court;

c.      All of Plaintiffs' recoverable costs, including but not limited to expert expenses;

d.      Plaintiffs' attorneys' fees;

e.      Prejudgment and post-judgment interest pursuant to applicable law;

f.      Such other and further relief as the Court finds just, proper, and/or equitable.

DATED this 9th day of July, 2025.

Respectfully Submitted,

*s/ Daniel K. Calisher*
Daniel K. Calisher
Bar No. CO00123
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, 6th Floor
Denver, Colorado 80209
Telephone: 303-333-9810
Email: calisher@fostergraham.com
*Attorneys for Plaintiffs*

47

_s/ Asher Perlin_
Asher Perlin
Bar I.D. FL0006
Law Office of Asher Perlin
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: 786-687-0404
Email: asher@asherperlin.com
_Attorneys for Plaintiffs_